IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERWINE'S HOME HEALTH CARE, INC.,
COLORADO HOME CARE, INC., and
POTOMAC HOME HEALTH CARE, INC.,

Plaintiffs,

v.

MICHAEL O. LEAVITT, Secretary,
Department of Health and Human Services,

Defendant.

Civil Action No. 05-2441 (ESH)

Judge Ellen Segal Huvelle

**EXHIBIT H TO PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**CMS-DEC, MED-GUIDE, ¶81,466, Professional Home Care, Inc. v. Blue Cross and Blue Shield Association, *CMS Administrator Decision*, (Jan. 13, 2006)**

© 2006, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Professional Home Care, Inc. v. Blue Cross and Blue Shield Association**

***CMS Administrator Decision***, Jan. 13, 2006.

**Medicare: Arrangements With Providers**

**Medicare Part A --Services furnished by an agency or others under arrangements --Employment status. --** An intermediary properly applied Salary Equivalency Guidelines to payments made by a provider to physical therapists employed by the provider, but paid on a per-visit basis, because the form of payment, and not the legal relationship, determined whether the services were performed "under an arrangement". Services performed "under an arrangement" are subject to Salary Equivalency Guidelines, which limit payment by a provider to the 75th percentile of salary ranges paid by providers in the geographic area for the same type of therapy. The physical therapists were paid by both salary and commission, received W-2s and fringe benefits, and had federal taxes withheld. This led the Provider Reimbursement Review Board (PRRB) to improperly conclude that the physical therapists performed services in an employment relationship with the provider, rather than "under an arrangement". As a result, the PRRB held that the compensation was not subject to Salary Equivalency Guidelines. However, where compensation, at least in part, is based on fee-for-service, it is treated as a payment for services "under an arrangement" and is subject to Salary Equivalency Guidelines. The PRRB also improperly found that the provider's costs were not substantially out of line with compensation paid by comparable providers. The provider's cost per visit was 8 percent higher than the "high" rate for the area, making its costs substantially out of line with the median of providers in the area.

See ¶1408.

**The decision of the PRRB (see ¶81,454) was reversed.**

**[Text of Decision]**

**CENTERS for MEDICARE & MEDICAID SERVICES**

DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

7500 Security Boulevard, Mail Stop C3-01-20

Baltimore, Maryland 21244-1850

**Office of the Attorney Advisor**

JAN 20 2006

**CERTIFIED MAIL**

John W. Jansak, Esquire

Harriman, Jansak & Wylie

401 Washington Avenue, Suite 803

Towson, MD 21204

Re: *Professional Home Care, Inc. Garvin and Moore, Oklahoma Professional HC 97 Access Infusion Group*, PRRB No. 2006-D6 (FYE 01/31/95; 01/31/96; 01/31/97 and 01/31/98)

Dear Mr. Jansak:

Enclosed is a copy of the Administrator's decision in the above case reversing Issue No. 1 and affirming Issue Nos. 2 and 3 of the decision of the Provider Reimbursement Review Board. This constitutes the final administrative decision of the Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within 60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn

Attorney Advisor

Enclosure

cc: James R. Grimes, Esquire, Intermediary's Representative

**CENTERS FOR MEDICARE & MEDICAID SERVICES**

***Decision of the Administrator***

**In the case of: PROFESSIONAL HOME CARE, INC., GARVIN and MOORE OKLA. PROFESSIONAL HC 97 ACCESS INFUSION GROUP Providers vs. BLUE CROSS AND BLUE SHIELD ASSOCIATION/CAHABA GOVERNMENT BENEFIT ADMINISTRATORS Intermediary**

**Claim for:**

**Determination of Reimbursable Costs for Cost Reporting Periods Ending 1/31/95; 1/31/96; 1/31/97 and 1/31/98**

**Review of: PRRB Decision No. 2006-D6**

**Dated: November 18, 2005**

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in section 1878(f)(1) of the Social Security Act (Act), as amended (42 USC 1395oo(f)). The Intermediary and CMS' Centers for Medicare Management (CMM) submitted comments requesting reversal of the Board's decision as to Issue No 1. The parties were notified of the Administrator's intention to review the Board's decision regarding Issue No 1. Comments were received from the Providers requesting affirmation of the Board's decision on Issue No. 1. Accordingly, this case is now before the Administrator for final administrative decision.

**ISSUE AND BOARD'S DECISION**

Issue No. 1 was whether the Intermediary's adjustment of the Providers' physical therapy costs was proper.[1]

The Board held that the Intermediary improperly applied the Salary Equivalency Guidelines (Guidelines) to the payments made by the Provider to those therapists who were employed by the Providers, but paid on a per-visit basis. However, the Board also found that the Intermediary properly applied the Guidelines to the Providers'

contract employees. The Board noted, in this case, that the therapists were employees, regardless of the method of payment (salary, salary plus commission or a fee-for-services), and were subject to the employer-employee relationship established by the Provider. The employees had Federal taxes withheld and received W-2s. In addition these employees received fringe benefits.

The Board found that the language of the controlling statute distinguishes services performed by employees of a provider from services that are performed "under an arrangement." Services performed by a physical therapist in an employment relationship with the provider are different from those services performed "under an arrangement." The Board noted that both the legislative and regulatory history indicate that the Guidelines were created to curtail and prevent perceived abuses in the practice of outside physical therapy contractors. The Board also noted that the term "under arrangement" is commonly referred to and used interchangeably with the term "outside contractor." Thus, the Board concluded that the guidelines do not apply to employee physical therapists even though they are paid a portion of their compensation on a fee-for-service basis.

The Board referred to *In Home Health v. Shalala*, 188 F.3d 1043 (8th Cir. 1999) and *High Country Home Health, Inc. v. Shalala*, 84 F.Supp.2d 1241 (D. Wy. 1999), which held that the Guidelines do not apply to in-house physical therapy staff.

The Board further found that the Guidelines should not be used in place of a prudent buyer analysis; rather, intermediaries should determine whether a provider's costs are "substantially out of line" by a comparison of those costs to those incurred by other similarly situated providers. The Board noted that in this instance, the Intermediary did not perform a prudent buyer analysis.

**COMMENTS**

The Intermediary commented, requesting that the Administrator reverse the Board's decision regarding issue number one. The Intermediary believes the Board's holding is contrary to prior Administrative decisions that have consistently reversed the Board's decision in other cases presenting the same issue. The Intermediary argued that the PRRB incorrectly ruled that the Intermediary's application of the Guidelines to the providers' employees was improper, and that the Guidelines do not apply to employee physical therapists even though they are paid on a fee-for-service basis. The Intermediary stated that this PRRB decision is contrary to CMS instructions and prior Administrator decisions.

The Provider commented requesting that the Administrator affirm the Board's decision. The Provider pointed out that the Federal courts have agreed with the Board's position, that "salaried" cannot be added to the statutory use of the term "employee."

CMM commented, requesting reversal of the Board's decision. CMM argued that the Intermediary's application of the salary equivalency guidelines to the Provider's physical therapists paid on a fee-for-service basis was appropriate based on the agency's authority to apply the guidelines under statute. CMM continued to maintain that the statute distinguishes between services furnished "under an arrangement" and those provided through a salaried "employee relationship" and therefore, the Provider's physical therapists' costs, which included both a salary and commission, were subject to the Guidelines. Further, because the plain language of the statute is silent or ambiguous on the issue of whether the Guidelines should be applied to employees compensated on a per-visit basis, CMS' interpretation should be upheld because it is reasonable under the statute. CMM noted that the language in the statute demonstrates that Congress assumed that an employment relationship necessarily entails compensation by salary. Further, CMM argued that, even if the Agency is not mandated under the statute to apply the guidelines to bona fide therapist employees of a provider who are paid on a per-visit basis, the Agency has the authority under section 1861(v)(1)(A) of the Act to define reasonable cost and establish and apply cost limits to different provider costs and different classes of providers to determine that they are recognized as reasonable in determining Medicare program payments. Finally, CMM noted the similarities of the issues presented in the case to those issues presented in prior Administrator's decisions.

**DISCUSSION AND EVALUATION**

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments are included in the record and have been considered.

Since its inception in 1966, Medicare's reimbursement of health care providers was governed by section 1814 (b)(1)[2] and section 1861(v)(1)(A) of the Act. Section 1861(v)(1)(A) of the Act provides that:

> Reasonable cost shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services....

In addition, the Secretary has been granted authority under section 1861(v)(1)(A) of the Act to establish:

> Limits on the direct and indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this title....

The Secretary has promulgated regulations at 42 CFR 413.9 which provide that all payments to providers of services must be based on reasonable costs of services covered under Title XVIII of the Act and related to the care of beneficiaries. In addition, the Provider must meet the documentation requirements of both the Act and the regulations in order to demonstrate entitlement to reimbursement.[3]

Finally, the regulations at 42 CFR 413.106(c)(5) states in part, "[u]ntil a guideline is issued for a specific therapy or discipline, costs are evaluated so that such costs do not exceed what a prudent and cost conscious buyer would pay for the given service." *Id.* This regulation is implemented by section 1403 of the Provider Reimbursement Manual (PRM), which reads in part, "[u]ntil specific guidelines are issued for the evaluation of the reasonable costs of other services furnished by outside suppliers, such costs will continue to be evaluated under the Medicare program requirement that only reasonable costs be reimbursed." *Id.*

A limitation on payments for the reasonable cost of physical therapy services under arrangement was established by section 251(c) of the Social Security Amendments of 1972[4] and section 17(a) of the Social Security Amendments of 1973.[5] These amendments added section 1861(v)(5)(A) of the Act which provides that:

> Where physical therapy services [and other therapy services] ... are furnished *under an arrangement* with a provider of services ... the amount included in any payment to such provider ... as the reasonable cost of such services ... shall not exceed an amount equal to the salary which would reasonably have been paid for such services ... to the person performing them if they had been performed in a employment relationship with such provider ... incurred by such person, as the Secretary may in regulations determined to be appropriate. (Emphasis added.)

Section 1861(w)(1) of the Act provides that:

> [T]he term "arrangements" is limited to arrangements under which receipt of payment by the ... home health agency ... (whether in its own right or as agent), with respect to services for which an individual is entitled to have payment made under this title, discharges the liability of such individual or any other person to pay for the services.

The Secretary implemented section 1861(v)(5)(A) through the promulgation of 42 CFR 413.106, which defines the Guidelines as reflective of the "amount equivalent to the prevailing salary and additional costs that would reasonably have been incurred by the provider ... had such services been performed by such person in an employment relationship." In turn, subsection (b) defines "prevailing salary" as:

> The hourly salary rate based on the 75th percentile of salary ranges paid by providers in the geographical area, by type of therapy, to the therapists working full-time in an employment relationship.

Consequently, the Guidelines, as explained at 42 CFR 413.106(b)(6), are the amounts published by the Secretary reflecting the application of section 413.106(b)(1) through (4) to an individual therapy services and a geographical area. Paragraph (c) of the regulation states that:

> Under this provision, HCFA will establish criteria for use in determining the reasonable costs of

physical ... therapy services ... furnished by individuals under arrangements with a provider of services.... It is recognized that providers have a wide variety of arrangements with such individuals. These individuals may be independent practitioners or employees of organizations furnishing various health care specialists. This provision does not require a change in the substance of these arrangements.

The Secretary's interpretation of the reasonable cost provision of section 1861(v)(1)(A), the provisions of section 1861(v)(5)(A) and the regulation at 42 CFR 413.106 is set forth in section 1403 of the PRM. First promulgated in 1977, section 1403 of the PRM states, *inter alia*, that:

The guidelines apply only to the costs of services performed by outside suppliers, not the *salaries* of provider's employees. However, the costs of the services of a salaried employee who was formerly an outside supplier of therapy or other services, or any new salaried employment relationship, will be closely scrutinized to determine if an employment situation is being used to circumvent the guidelines. Any costs in excess of an amount based on the going rate for salaried employee therapists must be fully justified.

In situations where compensation, at least in part, is based on a fee-for-services or on a percentage of income (or commissions), these arrangements will be considered nonsalary arrangements, and the entire compensation will be subject to the guidelines in this chapter. (Emphasis added.)

The Administrator disagrees with the Board's analysis of the case and the relevant law and policy. The Administrator finds that, after a review of the controlling law, legislative history of the Act, and relevant Medicare policy, the Intermediary properly applied the Guidelines to the Provider's physical therapy compensation. Contrary to the Board's finding that the employment relationship between the Provider and the physical therapists determined whether the Guidelines should be applied, the Administrator finds that the fee-for-service compensation of the Provider's therapists was the controlling factor in the application of the limits in this case.

First, in this case, the Board found that the Providers "employed" physical therapists. If the physical therapists were in fact employees, the Board asserts that the physical therapists were exempt from the physical therapy Guidelines. However, the Administrator notes that the Secretary is not bound by the Internal Revenue Services (IRS) provisions in determining Medicare reimbursement. The Administrator notes that these physical therapists may be employees under the IRS code but where compensation, at least in part, is based on fee-for-service, these payments are treated as nonsalaried payments under section 1402 of the PRM and nonemployment relationships for Medicare reimbursement purposes.

The specific salary arrangements in this case are not consistent with prudent practices associated with full time employment. In this situation, the payment arrangements for physical therapists are similar to nonsalaried personnel. The employment payment schemes for physical therapy services appear to be outside of a standard employment arrangement with the Provider and thus create the same opportunities for abuses as more traditionally defined contractor relationships. Consequently, wages paid on a fee-for-service or commissioned basis are governed by the Guidelines for purposes of Medicare reimbursement. The Administrator finds that section 1861(v)(1)(A) of the Act authorizes the Secretary to determine reasonable costs and to implement limits on costs. That the Secretary has chosen to apply the Guidelines to the cost of employee compensation on a fee-for-service basis is not inconsistent with that authority. The law is well established that section 1861(v)(1)(A) of the Act gives the Secretary "broad discretion" to determine what are reasonable costs.[6] The Administrator finds that the application of the Guidelines under these facts is a reasonable exercise of that discretion.

Moreover, with respect to the Secretary's authority to apply the Guidelines under these circumstances under the authority granted pursuant to section 1861(v)(5)(A) of the Act, the Administrator finds it significant that the plain language of section 1861(v)(5)(A) of the Act does not limit the application of the Guidelines only to non-employees or outside contractors. As evident from the foregoing statutory language, the phrase "under an arrangement" is not defined in the Act by reference to a legal employment situation under the IRS code, but rather, is defined in broad terms as where receipt of Medicare payment by a provider discharges the liability of the beneficiary to pay for such services. Although the language of section 1861(v)(5)(A) clearly applies in situations where there is an outside contractor relationship, the plain language of the statute does not actually define "under arrangement" with those terms and, thus, does not specifically exclude employment situations.

In addition, both the language of the statute and the legislative history of the Act support the conclusion that Congress was concerned with limiting costs associated with fee-for-service arrangements such as those in this

case. In drafting the language of section 1861(v)(5)(A), Congress chose to refer to the form of compensation, "salary," rather than the form of the legal relationship between provider and therapist to establish the standard for determining the applicable limits. Thus, this limit is established based on salary compensation, i.e., a fixed compensation which is periodically paid to a person for regular work or service.

Moreover, the legislative history clearly reflects that Congress expected this limit (salary-based) would be applied to fee-for-service arrangements, as Congress was concerned about the cost implications of therapy provided under fee-for-service arrangements, as opposed to salary-based compensation.[7] Thus, rather than focusing on the exact nature of the legal relationship between the provider and the therapists, Congress focused on the form of compensation to the therapists, viewing fee-for-service arrangements as the most likely area for uncontrolled costs and potential abuse.

Consequently, the statutory language of section 1861(v)(5)(A) and its legislative history all indicate that Congress did not contemplate all possible forms of fee-for-service arrangements and, thus, did not contemplate fee-for-service arrangements within the context of a formal employment relationship. However, it is equally evident that the purpose of enacting section 1861(v)(5)(A) of the Act was to place limits on physical therapy fee-for-service compensation costs. Because of the ambiguity of the language at section 1861(v)(5)(A), the Secretary's interpretation of the statute is entitled to considerable deference as long as it is reasonable.[8] The Administrator finds that the Secretary's interpretation of the Act, to consider the phrase "under arrangement" to include those employment situations where payment is on a per-visit or per-unit basis, is reasonable based on the ambiguous language of the statute, the clear congressional intent to control costs and abuses by limiting fee-for-service compensation, and the Secretary's concern about the possibility of providers circumventing that intent through what would appear to be employment relationships.

The language of section 1403 of the PRM specifically addresses two types of "employment" situations, i.e., 1) the "newly salaried" employees which the Secretary closely scrutinizes to make sure that an "employment situation is not being used to circumvent the guidelines," and 2) the "fee-for-service" compensated employees, which the Secretary treats as "nonsalary arrangement." As noted above, the Secretary's treatment of the latter situation, as a nonsalary arrangement, reflects the agency's assumption that such a compensation arrangement is subject to the same possible abuses that arise in the situation of the use of an outside contractor. Section 1403 of the PRM is therefore CMS' attempt to further congressional efforts to prevent such abuses, whether they arise through a clear outside contractor situation or through a hybrid employment/contractor situation, as in this case.

As reflected at section 1405 of the PRM, the Secretary believed that either way, the possibility of abusing the program for greater reimbursement was the same, and could reasonably be prevented using the same imposed compensation limits. Contrary to the Board's opinion, whether the therapist is an employee of the Provider or receives benefits from the Provider which employees typically receive, are not the significant factors in this case. To base the decision of whether the Guidelines apply simply by examining the form of the employment relationship, rather than by exploring its substance, would facilitate the types of program abuses which Congress was trying to prevent in its adoption of section 1861(v)(5)(A) of the Act.

Consistent with the above, the Administrator notes that the Secretary has amended her regulations, reiterating the longstanding policy of treating fee-for-service therapist services as "under arrangement" situations. The 1998 amendments to the regulation at 42 CFR 413.106(c)(5) provide that:

> If therapy services are performed in situations where compensation to a therapist employed by the provider is based, at least in apart, on a fee-for-service or on a percentage of income (or commission), the guidelines will apply. The entire compensation will be subject to the guidelines win cases where the nature of the arrangements is most like an under "arrangement" situation, although technically the provider may treat the therapists as employees. The intent of this section is to prevent an employment relationship from being used to circumvent the guidelines.

The Secretary explained in the preamble to the proposed rule of the above regulation at 42 CFR 413.106(c)(5) that:

> We are proposing to revise section 413.106(c)(6) that would provide that salary equivalency guidelines will apply in situations where compensation to a therapist employed by the provider is based, at least is part, on a fee-for-service or on a percentage of income (or commission). The entire compensation would be

subject to the guidelines in cases where the nature of the arrangements are most like an under "arrangement" situation, although technically the provider may treat the therapists as employees. The guidelines would be applied in this situation so that an employment relationship is not being used to circumvent the guidelines.

Since June 1977, there has been longstanding governing policy at section 1403 of the Provider Reimbursement Manual, Guideline Application, regarding this issue for making payments to providers.... This instruction clearly requires the intermediary to apply the salary equivalency guidelines in cases where the provider is paying the physical therapists on a fee-for-service basis. This instruction considered the nature of those arrangements and that they are most like an under "arrangement" situation, although technically they are employees. Therefore, the instructions further the statutory purpose as reflected in the legislative history of the salary equivalency guidelines. This instruction addresses the fact that HCFA recognizes that certain employment relationships would effectively circumvent the guidelines and provided for these circumstances in section 1403 of the Provider Reimbursement Manual.[9]

The Administrator finds that the foregoing regulatory language reflects a clarification in regulation of longstanding Medicare interpretative policy. Section 1403 of the PRM interprets and clarifies existing legislation and regulatory instruction regarding the Guidelines' applicability to physical therapist compensation paid under arrangements. Moreover, in this case, as discussed above, the policy of applying the Guidelines to fee-for-service arrangements has been in section 1403 of the PRM since 1977.

The Provider argued that the Guidelines had not been properly updated and that the rate has fallen far behind the salaries which the market actually requires.[10] The Administrator notes that Congress did not specify, when adding §1861(v)(5)(A), the primary or secondary sources of the data used to develop the Guidelines, nor did it specify how often the Guidelines were required to be updated or rebased. Instead, the Act delegated to the Secretary the discretion to determine the appropriate Guidelines pursuant to the promulgations of regulations. However, consistent with the Act, the Senate Committee on Finance stated that:

To the extent feasible, timely and accurate, salary data compiled by the Bureau of Labor Statistics would be used in determining the 75th Percentile level of salaries in the area. S.Rep. No. 92-1230, 92nd. Cong. 2nd Sess. 251 (1972).

The Secretary provided for the published guideline amount to be adjusted upward and "updated" by a factor equal to 0.6 percent for each lapsed month between October 1, 1982 and the beginning month of the provider's cost reporting period.[11] Congress did not specify how often the Guidelines were required to be rebased. Significantly, there is no regulatory requirement that the Guidelines be rebased at a particular time or updated by a specified increase or decrease in the base figure. Therefore, the Secretary is not bound to a yearly update or rebasing schedule.

The Board found that the Intermediary failed to prove that the costs for its employee physical therapists are substantially out of line with physical therapy costs paid by similar home health agencies. However, the regulation at 42 CFR 413.106(c)(5) provides that these costs are evaluated so that such costs do not exceed what a prudent and cost conscious buyer would pay for the given service. The Administrator notes that the Provider's physical therapy costs exceeded the Guidelines. The Secretary has determined that in such circumstances the Provider's rate per visit was not what a prudent and cost conscious buyer would pay for the given service. However, rather than an irrebuttable presumption of unreasonableness, the Secretary in fact allows providers to demonstrate that they are entitled to exceptions to the application of the Guidelines under certain circumstances[12]

The Providers contended that the amounts paid were reasonable and not out-of-line with compensation paid by comparable providers. The Providers also argued that their rate of $64.39 for fiscal year 1998 was 20 percent lower than the revised rate and therefore reasonable.[13] However, the Administrator notes that when comparing the Providers' rates of $64.38 per visit to the 1997-1998 Homecare Salary & Benefits Report,[14] the `high' rate for physical therapists paid on a per-visit basis in Oklahoma was $59.53 per visit. Consequently, the Administrator finds that the Providers' cost per visit of $64.38 is 8 percent higher than the `high' rate from the survey. Thus, examining the Providers' fee-for-service "employee" costs alone, the Administrator finds that the Providers' fee-for-service per visit cost of $64.38 was substantially out-of-line with the amount paid by the median of providers in the 1997-1998 Homecare Salary & Benefits Report. Consequently, even applying a substantially out-of-line standard, the Intermediary properly adjusted the Providers' costs,

**DECISION**

Consistent with the foregoing opinion, the Administrator reverses the Board's decision in this case, as it pertains to Issue No. 1 with respect to the physical therapists treated as employees but paid on a fee-for-service basis. The Intermediary properly applied the Salary Equivalency Guidelines to the Providers' physical therapy compensation. Additionally, the Administrator summarily affirms the Board with respect to Issue Nos. 2 and 3.

**THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES**

Date: *1/13/06*

[1] The case also involved two other issues. Issue No 2 involved whether the Intermediary's adjustments to the Providers' travel costs were proper. Issue No. 3 involved whether the adjustments to the Providers' home infusion costs were proper. The Board affirmed the Intermediary's adjustments as to Issue Nos. 2 and 3. The Administrator summarily affirms the Board's decisions on those issues.

[2] 42 USC 1395f(b)(1).

[3] Section 1815 of the Act (42 USC 1395g); 42 CFR 413.20; 42 CFR 413.24.

[4] Pub. Law 92-603.

[5] Pub. Law 93-233.

[6] See, e.g., *Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 411, 419 (1993); *Mt. Diablo County Hosp. v. Bowen*, 811 F.2d 38, 3443 (7th Cir. 1987) (section 1861(v)(1)(A) gives the Secretary wide latitude in prescribing regulations governing the process of determining reasonable costs). In *Good Samaritan*, the Supreme Court noted that section 1861(v)(1)(A) "explicitly delegates to the Secretary the authority to develop regulatory methods for the estimation of reasonable costs," 508 U.S. at 418, and likened this authority to the "exceptionally broad authority" that Congress bestowed upon the Secretary in other areas of the Social Security Act. *Id.* Pursuant to this authority, the Secretary has promulgated regulations establishing cost limits, *see* 42 CFR 413.30, and has provided that the cost limits may be calculated on a "per admission",per discharge, per diem, per visit, or other basis, *Id.* at 413.30(a)(2) (Emphasis added).

[7] S. Rep. No. 92-1230, 92nd Cong., 2nd. Sess. 52 (1972) (provision will "limit reimbursement for physical and other therapist to a reasonable salary related basis rather than a fee for services basis."); H. Rep. 992-231. 92nd Cong. 1st Sess. 110 (1971) ("Committee bill includes ... provisions for controlling program expenditures for therapy services ... and for preventing abuse"); S. Rep No. 93-533, 93rd Cong. 1st Sess. 68 (1973) ("the cost that would have been occurred if payment had been on a reasonable salary-related basis rather than on a fee-for-service").

[8] *See Chevron U.S.A., Inc. v. National Resources Defense* Council, Inc., 467 U.S. 837, 842-43 (1984). Where a statute is silent or ambiguous on the issue in question, the interpretation of the agency charged with administering the statute is entitled to deference as long as it is a reasonable one.

[9] 62 Fed. Reg. 14851, 14871 (Mar. 28, 1997)(proposed rule); *see also* 63 Fed. Reg. 5106, 5126 (January 1, 1998) (final rule).

[10] The Provider may request an exception to the cost guidelines due to unique circumstances or *special market conditions*. The Provider did not do so in this case.

[11] 48 Fed. Reg. 44922, 44924, 44928; *see also* PRM-1, Section 1499, Exhibit A-8.

[12] Moreover, a closer examination of the record shows that the Providers employed both contract physical therapists for whom they paid benefits and physical therapists treated as "employees" that were paid on a fee-for-service basis. While the Administrator disagrees with the Board with respect to the physical therapists treated as

"employees" that were paid on a fee-for-service basis, the Administrator agrees with the Board's ruling that Intermediary properly applied the Guidelines to the "contract" physical therapists.

13 *See*, e.g., Providers' Exhibit 1; Case No. 00-1426.

14 *See* Intermediary Position Paper p. 15 and Intermediary Exhibit I-29.

---

© 2006, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**CMS-DEC, MED-GUIDE, ¶81,454, Professional Home Care, Inc. (Garvin and Moore, OK) v. BlueCross BlueShield Assoc., *PRRB Hearing* Dec. No. 2006-D6, Case Nos. 97-2444; 98-2580, 99-3445; 99-3383G (group) and 00-1426, (Nov. 18, 2005)**

© 2006, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Professional Home Care, Inc. (Garvin and Moore, OK) v. BlueCross BlueShield Assoc.**

***PRRB Hearing*** Dec. No. 2006-D6, Case Nos. 97-2444; 98-2580, 99-3445; 99-3383G (group) and 00-1426, (cost reporting periods ending 01/31/95-01/31/98), Nov. 18, 2005.

**Medicare: Therapy Services**

**Cost apportionment, cost finding --Ancillary services --IV therapy service costs. --**
The intermediary properly adjusted two home health agencies' (HHAs) home infusion costs, placing intravenous (IV) drug costs in a non-reimburseable component on their home office cost report. The HHAs furnished IV services to both Medicare and non-Medicare patients in their homes. Medicare did not cover the cost of the IV drugs for HHAs during these cost reporting periods, which pre-dated the prospective payment system. Therefore, the home office set up a separate corporation to handle billing for both IV drugs and the IV visits for non-Medicare patients. The corporation subcontracted with and paid the HHAs for the IV visits and paid the pharmacies for the IV drugs. The HHAs failed to identify and allocate the costs of time and effort spent by the home office in paying for the drugs, billing third parties for the cost of the drugs and paying the HHAs for delivery of the IV visits to a non-reimburseable cost center. The HHAs submitted cost reports that included all of the costs associated with the corporation. The intermediary properly placed the IV drug costs in a non-reimburseable cost center on the home office Schedule G, then allocated overhead costs based on total cost of goods sold, and disallowed the costs. Because the corporation was a separate legal entity in the home office, it was properly treated as a non-reimburseable cost center.

See ¶6105.31.

**Medicare: Travel Costs**

**Cost reports, allowable costs --Costs related to patient care --Visiting costs of home health agencies. --**
The intermediary's reduction of the provider's claims for travel costs and disallowance of hotel costs incurred by the owner and chief executive officer (CEO) for travel from the home office to the facility (approximately 45 miles or an hour away) was proper. The short distance between the facility and the home office was a normal commuting distance. Also, there was inadequate justification for the CEO to visit the facility on an almost daily basis when his work site was at the home office.

See ¶5908.

**Medicare: Therapy Services**

**Cost reports, allowable costs --Principle --Fee-for-service employees --**
The intermediary's reimbursement reduction by way of application of Medicare's salary equivalency guidelines (see 42 C.F.R. §413.106) was improper as to employees, but proper as to the compensation of contract physical therapists. The home health agencies (HHAs) furnished services through both contract and employed therapists who were paid on a per-visit basis. The HHAs incurred salary, benefit, travel, training, and other expenses for all the therapists. The intermediary's application of the salary equivalency guidelines to the providers' employees was improper because the controlling statute distinguishes physical therapy services performed by employees of a provider from those that are performed "under arrangement" (see Soc. Sec. Act §1861(v)). Even though employed physical therapists were paid on a fee-for-service basis, the legislative and regulatory history of the guidelines indicate that they were created to curtail and prevent abuse by outside physical therapy contractors. Also, the term "under arrangement" is commonly referred to and used interchangeably with the term "outside contractor". Because physical therapists employed through a contract were not "employees" under the guidelines, even though the provider paid for their benefit costs, the application of the guidelines to their visits was appropriate.

See ¶5849D-2.30.

**[Text of Decision]**

**ISSUES**

1. Whether the adjustments to the Providers' physical therapy costs were proper --applies to Case Nos. 97-2444, 98-2580, 99-3445 and 00-1426.

2. Whether the adjustments to the Providers' travel costs were proper --applies to Case Nos. 97-2444 and 98-2580.

3. Whether the adjustments to the Providers' home infusion costs were proper --applies to Case Nos. 99-3383G and 00-1426.

***STATEMENT OF THE CASE AND PROCEDURAL HISTORY:***

Professional Home Care, Inc. (Providers) consists of two Medicare-certified home health agencies (HHAs) located in Garvin and Moore, Oklahoma. The Providers also have a corporate home office in Moore, Oklahoma. The Providers submitted cost reports for the fiscal years ended January 31, 1995 through January 31, 1998. Cahaba Government Benefit Administrators (Intermediary) adjusted the Providers' cost reports to reduce their claims for physical therapy, travel and home infusion costs. The Providers appealed the adjustments to the Provider Reimbursement Review Board (Board) pursuant to 42 C.F.R. §§405.1835-405.1841. The amount of Medicare reimbursement in controversy is approximately $75,000 for physical therapy; $24,000 for travel; and $60,000 for home infusion.

The Providers were represented by John W. Jansak, Esquire, of Harriman, Jansak & Wylie. The Intermediary was represented by James Grimes, Esquire, of Blue Cross Blue Shield Association.

***MEDICARE STATUTORY AND REGULATORY BACKGROUND***

The Medicare program provides health insurance to aged and disabled persons. 42 U.S.C. §§1395-1395cc. The Secretary of the Department of Health and Human Services (Secretary) is authorized to promulgate regulations prescribing the health care services covered by the program and the methods of determining payments for those services. The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (DHHS) charged with the program's administration. CMS has entered into contracts with insurance companies known as fiscal intermediaries to maintain the program's payment and audit functions. Intermediaries determine payment amounts due providers of health care services (e.g., hospitals, skilled nursing facilities, and home health agencies) under Medicare law and interpretative guidelines issued by CMS.

At the close of its fiscal year, each provider submits a cost report to its intermediary showing the costs it incurred during the period and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider, and notifies the provider in a Notice of Program Reimbursement (NPR). 42 C.F.R §405.1803. A provider dissatisfied with the intermediary's determination may file an appeal with the Board within 180 days of the NPR. 42 U.S.C. §1395oo; 42 C.F.R. §405.1835.

***Issue 1 --Physical Therapy Costs***

The Medicare Program reimburses providers for the reasonable costs they incur to furnish physical and other therapy services to Medicare beneficiaries. The statute at 42 U.S.C §1395x(v)(1)(A) provides, in part, that the reasonable cost of any service shall be the actual cost incurred, excluding any part of such costs found to be unnecessary in the efficient delivery of needed health services. The statute also authorizes the Secretary to establish cost limits. Essentially, the limits recognize reasonable costs based upon estimates of costs found to be necessary in the efficient delivery of covered items and services.

With respect to therapy costs, the statute at 42 U.S.C §1395x(v)(5)(A) states:

> Where physical therapy services, occupational therapy services, speech therapy services, or other therapy services or services of other health-related personnel (other than physicians) are furnished under an arrangement with a provider of services or other organization, ... the amount included in any payment to such provider or other organization under this subchapter as the reasonable cost of such services (as furnished under such arrangements) shall not exceed an amount equal to the salary which would reasonably have been paid for such services ... to the person performing them if they had been performed in an employment relationship with such provider or other organization (rather than under such arrangement) plus the cost of such other expenses ... incurred by such person, as the Secretary may in regulations determine to be appropriate.

The implementing regulation at 42 C.F.R. §413.106 states in relevant part:

> *(a) Principle.* The reasonable cost of the services of physical, occupational, speech, and other therapists, and services of other health specialists (other than physicians), furnished under arrangements (as defined in section 1861 (w) of the Act) with a provider of services, a clinic, a rehabilitation agency or a public health agency, may not exceed an amount equivalent to the prevailing salary and additional costs that would reasonably have been incurred by the provider or other organization had such services been performed by such person in an employment relationship, plus the cost of other reasonable expenses incurred by such person in furnishing services under such an arrangement. However, if the services of a therapist are required on a limited part-time basis, or to perform intermittent services, payment may be made on the basis of a reasonable rate per unit of service, even though this rate may be greater per unit of time than salary-related amounts, if the greater payment is, in the aggregate, less than the amount that would have been paid had a therapist been employed on a full-time or regular part-time salaried basis.

During the fiscal years under appeal, the Providers furnished physical therapy services to Medicare and non-Medicare patients. The Providers submitted 100 percent of the physical therapy costs and visits on worksheet A-8-3 of their Medicare cost reports for each year under appeal. The Intermediary reduced the number of hours submitted on worksheet A-8-3 to equal one hour per visit because the Providers could not provide documentation to support more than one hour per visit. In addition, the Intermediary adjusted the physical therapy cost limits to those published in the Federal Register. These adjustments reduced reimbursement for physical therapy services furnished by the Providers employees by applying the Medicare program's salary equivalency guidelines for physical therapy pursuant to 42 C.F.R. §413.106.

The Providers furnished physical therapy services through employees with whom they had contracts under which they were paid on a per-visit basis. The Intermediary reviewed financial records indicating that the Providers incurred salary expenses, benefit expenses in the form of insurance and taxes, auto and travel expenses, contracted expenses and training expenses for these employees. The financial statements indicated that physical therapy services were provided by both employed physical therapists and contracted physical therapists. Based on documentation available to the parties, they stipulated to the split of costs and visits between employed and contracted physical therapy services. *See* Stipulation of Facts dated March 31, 2004.[1]

***PARTIES' CONTENTIONS***

The Providers acknowledge that 42 U.S.C. §1395x(v)(5)(A) allows the Secretary to set cost limits for physical therapy services furnished "under an arrangement." The Providers contend, however, that these services were performed by its employees under Internal Revenue Service (IRS) definitions and it should not matter that they were paid on a "per-visit" basis. The Providers also assert that the amounts paid were reasonable and not out of line with compensation paid by comparable providers. The Providers argue that the physical therapy guidelines had not been properly revised for many years until fiscal year 1998, and thus the per-visit limits for the years under appeal were unreasonably low. When the rates were revised in January of 1998,[2] they were increased by about 42 percent to $73.95.[3] The Providers point out that their rate of $64.39 for fiscal year 1998 was 20 percent lower than the revised rate and therefore reasonable.[4]

The Intermediary asserts that CMS Pub. 15-1 §1403 requires it to treat situations where compensation is based in part on a fee-for-service basis as non-salary arrangements subject to the guidelines. The Intermediary

also argues that the Providers' costs were substantially out of line because their costs for physical therapy services exceeded the guidelines.

***FINDINGS OF FACT, CONCLUSION OF LAW AND DISCUSSION:***

The Board, after consideration of the Medicare law and guidelines, the parties' contentions, and evidence presented, finds and concludes as follows:

The Board finds that the guidelines should not be applied to the Providers' employees. The Board, however, does not consider the physical therapists employed through a contract to be employees of the Provider even though the Provider paid for their employee benefit costs. Therefore, the application of the guidelines to these visits was appropriate.

With respect to the Providers' physical therapist employees, the Board notes that the Providers paid both their employees and contractors on a per-visit basis. The Intermediary applied the salary equivalency guidelines contained in CMS Pub. 15-1 §1400 to the employee therapists' compensation, thereby reducing the Providers' allowable program costs and reimbursement.

The Intermediary contends that applying the guidelines to the Providers' employee costs is appropriate based upon CMS Pub. 15-1 §1403, which states:

> [i]n situations where compensation, at least in part, is based on a fee-for-service or on a percentage of income (or commission), these arrangements will be considered nonsalary arrangements, and the entire compensation will be subject to the guidelines in this chapter.

In addition, the Intermediary argues that its application of the guidelines to the Providers' physical therapy costs is appropriate pursuant to Medicare's prudent buyer principles found at CMS Pub. 15-1 §2103. Specifically, it is the Intermediary's position that the fact that the Providers' physical therapy costs exceeded the guidelines proves that the costs are not reasonable and are, in fact, substantially out of line. 42 C.F.R. §413.9.

The Board finds that the Intermediary's application of the salary equivalency guidelines to the Providers' employees was improper. With respect to the Intermediary's first argument, the Board finds that 42 U.S.C. §1395x (v)(5)(A), the controlling statute, distinguishes physical therapy services performed by employees of a provider from those that are performed "under an arrangement." Both the legislative and regulatory history of the guidelines indicate that they were created to curtail and prevent perceived abuse in the practice of outside physical therapy contractors. The Board also notes that the term "under arrangement" is commonly referred to and used interchangeably with the term "outside contractor." Accordingly, the Board finds that the guidelines do not apply to employee physical therapists even though they are paid on a fee-for-service basis.

Federal courts have also accepted the Board's rationale. *See In Home Health, Inc. v. Shalala*, 188 F.3d 1043 (8\th/ Cir. 1999) (*In Home*); *High Country Home Health, Inc. v. Shalala*, 84 F. Supp. 2d 1241 (D. Wy. 1999). The Court in *In Home* stated:

> 42 U.S.C. §1395x(v)(5)(A) does not provide a basis for the application of the Guidelines to In Homes' employee physical therapists. The first part of the sentence in 42 U.S.C. §1395x(v)(5)(A) explains that the subsection applies to persons providing physical therapy services "under an arrangement" with a provider. The second part of the sentence explains that the reasonable cost of compensation for the persons "under an arrangement" is calculated by reference to the salary which would have reasonably been paid to the person if that person had been in an "employment relationship" with the provider. The plain meaning of 42 U.S.C. §1395x(v)(5)(A) and 42 C.F.R. §413.106, which uses similar language, distinguishes between services provided "under an arrangement" and those provided by a person in an "employment relationship." It is clear from the language that a physical therapist who is "under an arrangement" is different from a person in an "employment relationship" with the provider. The Guidelines apply to a person "under an arrangement." The final notice in the Federal Register indicates that a person "under an arrangement" is an outside contractor. The Secretary's attempt to now further limit the term "employment relationship" to mean only salaried employees is not supported by the statute or the Secretary's contemporaneous interpretation as reflected in the 1992 regulation.... Thus, the statute requires nothing more than that a provider should be reimbursed for the services performed by a nonemployee, i.e., an outside contractor working under an

arrangement with the provider, similarly to what an employer reasonably would pay its employee for such services. Services provided by a provider's employee are themselves subject to a reasonableness requirement. See 42 U.S.C. §1395x(v)(1).... We affirm the district court's reversal of the Secretary's decision and hold that the secretary may not apply the Guidelines to In Home's employee physical therapists.

With respect to the Intermediary's second argument, the Board finds that the guidelines should not be used in place of a prudent buyer analysis. Rather, intermediaries should determine whether or not a provider's costs are "substantially out of line" by a comparison of the provider's costs to those incurred by other similarly situated providers. In the instant case, the Intermediary did not perform a prudent buyer analysis.

The Providers note that the guidelines applicable to their cost reports were outdated because they were developed from 1983 data. The Board agrees that when CMS reissued guidelines in 1998, the guideline for Oklahoma increased from $52.44 to $73.95, or approximately 42 percent over the rate that was in effect just one year earlier. The Board concludes that this supports the argument that the guideline amounts were insufficient and should not be used as an established "prudent buyer" limit. *See SNI Home Care. Inc. v. Blue Cross Blue Shield Association/Cahaba Government Benefit Administrators*, PRRB Dec. No. 2003-D11, December 20, 2002, *rev'd*, CMS Administrator, February 13, 2003.

***Issue 2 --Travel Costs***

The Providers claimed the travel costs incurred by their owner and chief executive officer (CEO) for travel from the home office where his position was located in Moore, Oklahoma, a suburb of Oklahoma City, to its facility site in Pauls Valley, Oklahoma. The distance between the sites was stated to be 45 miles with a travel time of one hour. Tr. at 20. Due to the extent of business at the Pauls Valley facility, the CEO often stayed there for 3 or 4 nights per week. The CEO claimed travel costs to the Pauls Valley facility, including gas expenses and hotel costs, for 45 weeks in fiscal year 1995 and 23 weeks in 1996. Tr. at 43.

The Intermediary reviewed the CEO's hotel expense and disallowed the cost because it was not prudent for the CEO to incur hotel expenses when staying in a town within a reasonable driving distance from his residence. Additionally, the Intermediary viewed the mileage cost claimed as commuting costs and, therefore, disallowed those costs as well.

***PARTIES' CONTENTIONS:***

The Providers assert that the travel expenses should be handled under IRS rules that permit travel expenses if one is temporarily away from home overnight for business purposes. Since the CEO's home was where the corporate home office was located, travel expenses to the Pauls Valley facility should be permitted. In addition, since the CEO had to visit the Pauls Valley facility for several days each week and it was an hour each way to that facility, it would necessitate two hours in travel time each day. The Providers assert that it was not reasonable or necessary for the CEO to return home each night.

The Intermediary claims that it made its audit adjustments to the Providers' travel costs in accordance with 42 C.F.R. §413.9 --Cost Related to Patient Care and Provider Reimbursement Manual (PRM) Sections 2102.1 --Reasonable Costs, Section 2103 --Prudent Buyer and Section 2114.2 --Transportation Costs. The Intermediary notes that on several occasions, the CEO would travel to Pauls Valley, return to Moore, and then return to Pauls Valley on the same day. The Intermediary contends the two offices were driving distance and it was not unreasonable to expect the CEO to return home on the same day instead of incurring unnecessary hotel expenses. In addition, the Intermediary argues that the CEO's travel patterns suggest that the mileage costs were commuting expenses, which is not a Medicare reimbursable cost.

***FINDINGS OF FACT,CONCLUSIONS OF LAW AND DISCUSSION:***

The Board, after consideration of the Medicare law and guidelines, the parties' contentions, and evidence presented, finds and concludes as follows:

The Board recognizes that the CEO may need to visit branches on a routine basis to ensure their operational efficiency. However, it does not find adequate justification for the CEO to visit the Pauls Valley facility on an almost daily basis, almost every week, when his purported work site is in the corporate home office. The Board also finds that the short distance between the Pauls Valley facility and the home office is considered a normal

commuting distance. The Board, therefore, finds that the Intermediary adjustments denying the CEO's travel costs are proper.

***Issue 3 --Home Infusion Costs***

The Providers provide intravenous (IV) services to both Medicare and non-Medicare patients in their homes. Although Medicare covers the cost of coordinating and administering IV drugs, i.e, the cost of the IV visit, Medicare does not pay for the cost of the IV drugs. Home Health Agency Manual (Pub. 11) §205.1B4. For non-Medicare patients, insurers typically pay for the cost of the IV visit and the IV drugs. Because of the difference in coverage, the Providers had different billing procedures for Medicare and non-Medicare patients for IV services. For Medicare patients, the Providers billed Medicare for the IV visit, and the patients had to pay the pharmacy for IV drugs out of their own pockets. For non-Medicare patients, a separate corporation called "ACCESS" was set up in the home office. ACCESS billed insurers for the IV drugs and the IV visits. ACCESS subcontracted with and paid the Providers for the IV visits and paid the pharmacies for the IV drugs. For both Medicare and non-Medicare patients, the IV drugs were either delivered directly to the patient's home by the pharmacy or were picked up by the Providers' staff on their way to the IV visits. In neither case did the Providers store or maintain IV drugs at their facilities.

The Providers did not claim any costs associated with ACCESS on the home office cost statement. Instead, in order to apportion the IV infusion service costs between Medicare and non-Medicare patients, the Providers included all of the costs in their cost reports. These cost included salaries, benefits and drug costs. During the audit, the Intermediary made an adjustment placing all costs associated with ACCESS IV visits in a non-reimbursable component on schedule G of the home office cost statement. The Providers and the Intermediary subsequently entered into an administrative resolution in which the salary and benefit costs portion of the adjustment was reversed. Thus, the only unresolved issue is the proper treatment of the cost of the IV drugs related to these visits. Because the IV drug costs remained in a non-reimbursable cost center as a statistic on the home office statement, they were then apportioned overhead costs from the pooled overhead costs. The total amount of pooled overhead cost allocated to the non-reimbursable cost center set up for ACCESS, and thus disallowed, was approximately $66,000. Tr. at 134.

***PARTIES' CONTENTIONS:***

The Providers assert that the IV drugs used for ACCESS patients should not be treated as the cost of goods sold. The Providers state that they did not inventory the IV drugs and that the IV drugs were ordered by the patients' physicians and prepared by independent pharmacies. The function of ACCESS is to pay for the IV drugs by writing checks to the pharmacies, to pay the Providers to conduct the visits and to bill the third party insurer. The Providers note that their staff sometimes pick up the IV drugs from the pharmacy on the way to the visit, but that they also do this for Medicare patients. The Providers claim that ACCESS is basically a shell company without employees and that the providers merely write a small number of checks. The Providers assert that the allocation of $66,000 in overhead costs to this minor activity is inappropriate and amounts to inappropriate shifting of costs from the Medicare program.

The Intermediary contends that the Providers' home office supported both the Medicare-certified HHAs and other health related entities, including ACCESS. Therefore, general overhead costs must be allocated to the various components. The Intermediary notes that the method of allocation is specified in CMS Pub. 15-1 §2150.3. The manual allows both direct and functional allocation of costs where the costs that relate to specific components are identifiable. Where these costs are not identifiable, costs are allocated from the pooled costs to the various components based on the total costs of the components. Since the Provider has not allocated any overhead costs to ACCESS based on either the direct or functional method, the Intermediary, under the manual instructions, must allocate costs to ACCESS based on the total costs of the components.

The Intermediary argues that it is appropriate to treat the cost of IV drugs as cost of goods sold because they were obtained and paid for by ACCESS for its patients. As a component of that service, the cost of IV drugs needs to be included in the total cost statistic on schedule G of the home office cost report. The Intermediary also rejects the Providers' assertion that the only cost associated with ACCESS was the writing of a few checks. The Intermediary claims that ACCESS was organized as a separate corporation legally and functionally and that there had to be costs to establish the corporation, set up contracts, bill insurers and to pay pharmacies and the Providers. The Intermediary disputes the Providers' claim that the only cost that ACCESS incurred was for writing a few checks. Since the Providers have not made any direct or functional allocation to ACCESS, the Intermediary

must allocate overhead based on total costs of goods sold. CMS Pub. 15-1 §2150.3D.2(b).

***FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:***

The Board, after consideration of the Medicare law and guidelines, the parties' contentions, and evidence presented, finds and concludes as follows:

The Board agrees that ACCESS is a separate legal entity in the home office that must be treated as a non-reimbursable cost center. The Board also finds that the Providers' involvement in the billing and payment for the IV drugs makes it appropriate to treat them as cost of goods sold for the purpose of allocation of overhead costs. The Board is sympathetic to the Providers' argument that the high cost of these drugs may not reflect the actual amount of time and effort spent by the home office in paying for the drugs, billing third parties for the cost of the drugs and paying the Providers for delivery of the IV visits; however, the Board agrees with the Intermediary that it is impossible that no employee time or expense is associated with operating ACCESS. The Board finds that the Providers could have identified these costs and directly or functionally allocated them to a non-reimbursable cost center. Since the Providers did not use a more sophisticated method to identify and allocate these costs, the Board finds the Intermediary's use of IV drugs as the cost of goods sold to be proper.

***DECISION AND ORDER:***

***Issue 1 --Physical Therapy Costs:***

The Intermediary's application of Medicare's salary equivalency guidelines to the compensation of physical therapists that were employed by the Providers but paid on a per-visit basis was improper. The Intermediary's application of the guidelines to the Providers' contract employees was proper. The Intermediary's adjustments are reversed for its salaried employees and affirmed for contract employees.

***Issue 2 --Travel Costs:***

The Intermediary's adjustments disallowing the CEO's travel costs were proper. The Intermediary's adjustments are affirmed.

***Issue 3 --Home Infusion Costs:***

The Intermediary's adjustments to the Providers' home infusion costs were proper. The Intermediary's adjustment is affirmed.

***Board Members Participating:***

Suzanne Cochran, Esquire

Gary Blodgett, D.D.S.

Martin W. Hoover, Jr., Esquire

Elaine Crews Powell, CPA

Anjali Mulchandani-West

*FOR THE BOARD:*

NOV 18 2005

Suzanne Cochran, Esquire Chairman

[1] Provider Exhibit 7; Case No. 99-3445.

[2] Provider Exhibit 2; Case No. 00-1426.

[3] Providers Exhibit 2; Case No. 00-1426.

[4] Providers Exhibit 1; Case No. 00-1426.

---

© 2006, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company